**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NO. 25-cr-00249-01** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **PHILLIP E KENDRIX (01)** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

**REPORT AND RECOMMENDATION**

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion to Suppress [doc. #20] filed by Defendant Phillip Kendrix ("Kendrix").  The motion is opposed. [doc. #24].  For reasons stated below, it is **RECOMMENDED** that the motion be **DENIED**.

**BACKGROUND**

On October 24, 2024, on or about 8:03 p.m., Deputy Chad Bennett ("Bennett") and Deputy Kelsey Hines ("Hines") (collectively "the Deputies") of the Ouachita Parish Sheriff's Office ("OPSO") observed a Chevrolet Tahoe making a left-hand turn from S. 7th Street into the far-right lane of Winnsboro Road.  [doc. #20].  Once Hines and Bennett were behind the Tahoe, Hines noted that the cover over the vehicle's license plate was tinted making it difficult to read.  *Id*.  At this point, the Deputies conducted a traffic stop of the vehicle.  *Id*.

The Deputies approached the vehicle and determined that the driver, later determined to be Kendrix, was the sole occupant of the vehicle.  [doc. #24].  Hines introduced himself to Kendrix and asked for his license and registration.  *Id*.  Kendrix reached into the passenger side of the vehicle and searched through various loose papers for the requested documentation.  *Id*.  While Kendrix searched for his license and registration Hines asked where Kendrix was headed.  Kendrix indicated that his destination was just ahead and inquired about the nature of the stop.  Hines

informed Kendrix of the improper left-hand turn Kendrix had made on Winnsboro Road. *Id*. Kendrix continued to search his pockets as well as the loose papers in his passenger seat for his license and registration for over a minute. *Id*.

At this point, Hines asked Kendrix to step out of the vehicle. *Id*. Immediately upon exiting the vehicle, Kendrix put both hands into the front pockets of his jeans. *Id*. Hines instructed Kendrix to keep his hands out of his pockets. *Id*. Kendrix responded that he was retrieving his license. *Id*. Kendrix pulled several cards from his pockets, one of which was his driver's license. *Id*. After retrieving his license, Kendrix again put his hands in his pockets and received another warning from Hines not to put his hands in his pockets. *Id*. Upon reaching for his pockets a third time, Hines informed Kendrix that he would be patted down for officer safety. *Id*. It was at this point that Bennett stated that Kendrix was behaving nervously. *Id*.

Bennett radioed dispatch to run a check of Kendrix's license. *Id*. The radio was being used by multiple law enforcement agencies, and several other requests for license checks were made at the same time. *Id*. While Bennett was waiting on a response to Kendrix's license check, Hines asked Kendrix if he had been "in trouble" before. *Id*. Kendrix responded that he only had a prior domestic charge from about ten years prior. *Id*. He then turned to Bennett and stated that he remembered Bennett from his time in Ouachita Correctional Center ("OCC"). *Id*. Hines noted that this was inconsistent with Kendrix's prior statement about his criminal history, as Bennett had not worked at OCC a decade ago. *Id*. Kendrix responded that he had been in OCC a couple of months prior for "a misunderstanding." *Id*.

Hines then asked Kendrix if the Deputies could search his vehicle, but Kendrix declined to give consent. *Id*. Hines advised that Bennett would bring out his canine because of Kendrix's nervous behavior. *Id*. Bennett received a response from dispatch that Kendrix had no active

2

warrants about thirty seconds prior to bringing out his canine. *Id.* The canine conducted an open-air sniff of the vehicle and alerted to the rear of the Tahoe. *Id.* Bennett explained to Kendrix that the canine was trained in narcotics detection and inquired if there were any narcotics in the vehicle. *Id.* Kendrix denied the presence of any narcotics in the vehicle but stated that someone had smoked in the Tahoe about eight hours prior. *Id.*

Bennett informed Kendrix that they would conduct a probable cause search of the vehicle. *Id.* The deputies also asked Kendrix what was in his pockets and placed Kendrix in handcuffs after he attempted to put his hands in his pockets once more. *Id.* Bennett searched Kendrix's person and found suspected methamphetamine, cocaine, and $479.00 in cash. Kendrix advised that he had used the drugs earlier in the day. *Id.* Bennett read Kendrix his *Miranda* rights and placed him into the patrol vehicle. *Id.* From the patrol vehicle, Kendrix continued to make several statements about the possession of the drugs. *Id.*

Upon searching the vehicle, the deputies found a Kel-tec .22 caliber pistol which was loaded with fifteen rounds of ammunition as well as a digital scale. *Id.* Kendrix was subsequently charged in Ouachita Parish with possession of a firearm by a convicted felon, two counts of possession of a controlled substance, and possession of a firearm while in possession of a controlled dangerous substance. *Id.*

On October 15, 2025, Kendrix filed the instant motion to suppress seeking the suppression of all evidence obtained through the warrantless search of his vehicle and any statements he made during the traffic stop. [doc. #20]. Kendrix contends that he was subjected to a search of his person and vehicle without a search warrant, and the Government cannot prove the existence of a valid exception to the warrant requirement. *Id.* Further, Kendrix argues that "all evidence resulting fruits, including Mr. Kendrix's interview must be suppressed." *Id.* Kendrix argues that the

3

Government did not properly comply with the Fifth Amendment's privilege against self-incrimination because the custodial interrogation was conducted following an illegal search and seizure. *Id*. Kendrix argues that "unless intervening events break the causal connection between the events" any confession obtained must be suppressed. *Id*.

The Government argues in its opposition that Deputy Hines developed reasonable suspicion that Kendrix was involved in criminal activity. [doc. #20]. The Government notes that Kendrix's behavior throughout the duration of the traffic stop gave deputies, considering the totality of the circumstances, reasonable suspicion. *Id*. The Government points to several parts of the interaction, including Kendrix's delay in providing his license and registration to the deputies, the numerous times the deputies had to request that Kendrix keep his hands out of his pockets, Kendrix's inconsistent statements about his criminal history, and his overall nervous demeanor. *Id*.

A hearing was held on the Motion to Suppress on November 17, 2025. [doc. #26]. Kendrix filed his post-hearing brief on January 26, 2026, reiterating his arguments that all evidence was seized as a result of an unreasonable search. [doc. #30]. Kendrix further argued that the purpose of the stop from its inception was to search for drugs and guns as evidenced by the fact that Hines informed Kendrix that the canine would be deployed less than four minutes into the traffic stop. *Id*. The Government filed its post-hearing briefing on February 23, 2026, following an extension, reiterating its arguments. [docs. #31, 32, 33]. Kendrix filed a repy on March 4, 2026. [doc. #34]. Accordingly, the matter is ripe.

### Relevant Testimony and Documentary Evidence

At the hearing, two witnesses testified: Hines and Bennett, who were both called by the Government. [doc. #27]. Additionally, the Government introduced four exhibits, all of which

were accepted into evidence. [doc. #28]. The first exhibit was a still image taken from Hines' body camera footage. *Id*. The second exhibit was the video recorded by Hines' body camera. *Id*. The third exhibit was another still image, this one taken from Bennett's body camera footage, and the fourth exhibit was the footage from Bennett's body camera in its entirety. *Id*.

The Court summarizes the relevant testimony and evidence as follows:

Prior to any witness testimony, the Government admitted all four exhibits without objection. (Hearing Transcript [doc. #29, p.5]) (hereinafter abbreviated as "Tr." Followed by the page number).

Hines is currently employed by the OPSO and has been for the last eight years. (Tr. 5). Prior to that, he was employed by the Monroe Police Department ("MPD") for just under two years. (Tr. 5). On October 24, 2024, Hines was part of a task force assigned to patrol high crime areas "looking for drugs, guns, warrants, and things of that nature." (Tr. 5-6). Hines confirmed that he was working with Bennett that night, who was the K-9 handler. Hines was traveling east toward South 7 when he saw the Chevrolet Tahoe turn left from South 7 onto Winnsboro in the far-right lane, a traffic violation. (Tr. 7). Upon approaching the vehicle, Hines also noted that the vehicle had a tinted license plate placard, a second traffic violation. (Tr. 7). At this point, Hines activated his emergency lights and initiated a traffic stop. (Tr. 8). The stop occurred in the cul-de-sac of Rowland Circle and Bruce Street. (Tr. 8).

Once the vehicle came to a stop, Hines approached the vehicle with his spotlight, identified himself, and advised the driver for the reason for the stop. (Tr. 9). Hines approached the vehicle's driver-side window and determined that the driver was the vehicle's sole occupant. (Tr. 10). Hines then requested the driver's license, registration, and proof of insurance. (Tr. 10). The driver then began to search through a "cluster of multiple papers" for the requested documentation. (Tr.

11).  Failing to find the documentation in the loose paperwork, the driver then began to search his person before returning to the cluster of papers.  (Tr. 11-12).  At this point, Hines asked the driver to step out of the vehicle, citing the driver's nervousness and officer safety concerns.  (Tr. 13).

Immediately upon exiting the vehicle, the driver put his hands into his pockets, prompting Hines to ask him to keep his hands out of his pockets.  (Tr. 14).   The driver responded that he was getting his driver's license and produced several cards, one of which was his license.  (Tr. 14). Hines thought it was strange that the driver was able to produce the license immediately when he got out of the vehicle.  (Tr. 14).  It was only at this time that the driver of the vehicle was identified as Kendrix.  (Tr. 15).  Upon providing his license, Kendrix immediately placed his hand into his right pocket, prompting a second warning from Hines.  (Tr.  15).  After a third time Kendrix reached for his right pocket, Hines moved the driver to the front of the patrol vehicle to perform a pat-down.  (Tr. 16).  Kendrix's hands were placed on the hood of the patrol vehicle for the pat-down.  (Tr. 17).  However, Kendrix removed his hands and turned when Hines attempted to pat-down his right pocket.  (Tr. 17).  When Hines was finally able to pat down the right pocket, Hines noted there was an item in the pocket.  (Tr. 18).  Hines inquired as to what was in the pocket, to which Kendrix responded it was "an inhaler."  (Tr. 18).

Following the pat down, Hines asked Kendrix if he had "ever been in trouble before" to determine if Kendrix had any prior charges related to guns or drugs.  (Tr. 19).  Kendrix initially avoided the question, but eventually answered that he had a domestic charge from ten to fifteen years prior.  (Tr. 19).  Kendrix then noted that he was familiar with Bennett from OCC.  (Tr. 20). Hines responded that Bennett had not been employed at OCC ten or fifteen years ago.  (Tr. 20). Hines took this as a second indicator that Kendrix was attempted to avoid questioning about his

criminal history. (Tr. 20). Kendrix then stated that he had been arrested a few months prior due to a "misunderstanding." (Tr. 21).

At this point Hines asked Kendrix if he could search the vehicle to which Kendrix responded that Hines would need a search warrant. Hines informed Kendrix that he was going to conduct an open-air sniff of the vehicle with the K-9 in the patrol vehicle. (Tr. 23). Bennett then retrieved K-9 Ready from the patrol vehicle and began the open-air sniff of the vehicle. (Tr. 26). K-9 Ready positively alerted to the presence of narcotics in the vehicle. (Tr. 29). Bennett informed Kendrix of the positive alert and asked if there were any narcotics in the vehicle. (Tr. 29). Kendrix denied any narcotics being in the vehicle but stated that someone had smoked in the vehicle several hours prior. (Tr. 29). Hines advised Kendrix that he was going to conduct a probable cause search of the vehicle based on Ready's positive alert. (Tr. 29).

Hines and Bennett then moved to place Kendrix in handcuffs based on the nervousness he exhibited after being informed that the vehicle was going to be searched. (Tr. 29). While handcuffing Kendrix, Hines noticed a cellophane wrapper protruding from Kendrix's right pocket. (Tr. 30). Hines, noting that this was the same pocket Kendrix had been exhibited nervousness about earlier in the stop, searched Kendrix's right pocket. (Tr. 31). Upon searching Kendrix's right pocket, Hines found what appeared to be crack and methamphetamine. (Tr. 31). Based on the felony level narcotics on Kendrix's person, Hines informed Kendrix of his Miranda rights. (Tr. 31-32).

After Kendrix was placed into the transport unit, Hines joined in the search of the Tahoe. (Tr. 33). When other deputies searched the Tahoe, they had located a digital scale with residue on it. (Tr. 33). In the space under the center console on the driver's side Hines located a firearm, prompting him to call for Bennett to come with his gloves. (Tr. 34). Hines then passed the firearm

7

off to Bennett to be secured.  (Tr. 35).  Once the firearm was secured, a criminal history check was run on Kendrix which came back showing Kendrix had prior felony charges as well as valid protective orders in place.  (Tr. 35).  Kendrix was arrested for possession of a firearm by a convicted felon, two counts of possession of Schedule II narcotics, two counts of violation of a protection order, and possession of a firearm in the presence of narcotics.  (Tr. 35).

On cross-examination Hines clarified that neither he nor Bennett called for additional officers or a transport vehicle prior to deploying the K-9.  (Tr. 53).  Hines also noted that he was unsure whether he had reviewed Bennett's written report on the stop and was, therefore, unaware of what details had or had not been included.  (Tr. 53).

The Government then called Bennett to the stand.  (Tr. 57).  Bennett is employed by the OPSO where he has worked for roughly seven and one-half years.  (Tr. 58).  Bennett is currently assigned to the patrol division in the K-9 unit.  (Tr. 58).  Bennett has been assigned to patrol for the last six years and in the K-9 unit for the last three years.  (Tr. 58).  Bennett took a 120-hour course at a K-9 school in South Louisiana focusing on narcotics detection and patrol work.  (Tr. 58).  Bennett was assigned the K-9, Ready, prior to the course and continues to work with the same K-9.  (Tr. 58).  K-9 Ready and Bennett were initially certified at the end of 2022 and must be recertified each year.  (Tr. 59).  Both K-9 Ready and Bennett have successfully recertified all three years.  (Tr. 59).  Bennett looks to K-9 Ready's body language to see a positive result, including changes in his breathing, turning his body to be vertical to the object being searched, and placing both paws on the object which contains the scent of narcotics.  (Tr. 60).

Bennett stated that when the traffic stop of Kendrix began, he approached the passenger-side window of the Tahoe.  (Tr. 63-64).  Bennett then continued around to the front of the vehicle after Hines instructed Kendrix to step out of the vehicle.  (Tr. 64).  Shortly after, Bennett and Hines

8

each grabbed one of Kendrix's arms to prevent him from reaching into his pockets.  (Tr. 64).

Bennett testified that they grabbed Kendrix's arms because it was unknown at that point if Kendrix

had anything in his pockets which could injure the officers.  (Tr. 65).  Bennett noted at this point

that Kendrix was acting nervously.  (Tr. 65).  At this point Hines moved Kendrix to the front of

the patrol vehicle to conduct a pat-down while Bennett took on a secondary role running a check

on his driver's license.  (Tr. 66-67).  Bennett was unable to receive an immediate response on the

license check as the channel was being used by multiple agencies.  (Tr. 68).

While Bennett was waiting for his turn to request a license check from dispatch, Kendrix

turned to Bennett and stated that he knew him from OCC.  (Tr. 70).  Bennett testified that in order

for Kendrix to have recognized him from his role at OCC, Kendrix would have been in OCC within

the year prior to October 2024.  (Tr. 71).

Approximately five minutes into the stop, Bennett received a response from dispatch that

Kendrix had no active warrants. (Tr. 73).

Within ten seconds of hearing the response from dispatch, Bennett heard Hines inform

Kendrix that they would be deploying the K-9 to do an open-air sniff.  (Tr. 74).  Bennett then

retrieved K-9 Ready from the vehicle and began conducting the open-air sniff of Kendrix's vehicle.

(Tr. 74).  K-9 Ready positively alerted to the presence of narcotics.  (Tr. 76).  Bennett then put K-

9 Ready back into the vehicle and informed Kendrix that they would be conducting a probable

cause search of his vehicle.  (Tr. 77).  Bennett then asked Kendrix what he had in his pockets,

given that Kendrix had been repeatedly trying to put his hands into his pockets throughout the stop.

(Tr. 77).  A key and other miscellaneous items were retrieved from Kendrix's left pocket, and

narcotics were found in the right pocket.  (Tr. 78-79).

9

On cross-examination Bennett testified that he and Hines were one of two teams in the task force that evening who had K-9s with them.  (Tr. 82).  Bennett also testified that the purpose of the patrolling that night was to find drugs and guns, but traffic stops are not made for the purpose of searching the vehicle.  (Tr. 83).  Bennett also clarified that he ran K-9 Ready at the request of Hines based on the interaction he had with Kendrix while Bennett was running the license.  (Tr. 91).  Bennett was also unsure exactly when the additional officers arrived, but confirmed they arrived at some point while they were making the call.  (Tr. 92).

## **LAW AND DISCUSSION**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." U.S. CONST. amend. IV.[1]  "The question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution." *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006) (citation omitted).

"The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (citations omitted).  Evidence obtained in violation of the Fourth Amendment is generally excluded and "cannot be used in a criminal proceeding against the victim of the illegal search or seizure." *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)).

---

[1] The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207 (1979) (citation omitted).

10

The purpose of this exclusionary rule is to deter unlawful police conduct. *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006). By refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused." *Id*. (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)).

Traffic stops are seizures within the meaning of the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 255 (2007). As traffic stops are considered investigative detentions rather than formal arrests, they are analyzed under the *Terry* framework. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Under that test, a traffic stop is permissible if (1) the officer's decision to initiate a traffic stop was justified at its inception and (2) the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop in the first place. *Terry*, 392 U.S. at 20.

To justify the decision to initiate a traffic stop, "'an officer must have an objectively reasonable suspicion'" that some sort of illegal activity, such as a traffic violation, has occurred or is about to occur. *United States v. Broadway*, 850 F. App'x 271, 272 (5th Cir. 2021) (per curiam) (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)). An officer has reasonable suspicion if he can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop. *Terry*, 392 U.S. at 21. Here, the traffic stop was justified at its inception by two traffic violations: Kendrix's license plate being improperly displayed and improper position and method of turning at an intersection. [doc. #24]. Those traffic violations are undisputed. [doc. #30]. Therefore, the first prong of *Terry* was satisfied, and the deputies were authorized to briefly detain Kendrix's vehicle.

11

However, seizures "justified only by a police-observed traffic violation" may not exceed the time reasonably required to "handle the matter for which the stop was made." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). Under *Terry*'s second prong, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc)). During a stop, an officer may "examine the driver's license and registration," "run a computer check," and "ask the driver about the purpose and itinerary of his trip." *Id*. at 430-31. At this stage, "the relevant question in assessing whether a detention extends beyond a reasonable duration is whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Brigham*, 382 F.3d at 511 (citation omitted). Though this "inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion," and the stop must end unless "additional reasonable suspicion arises . . . before the initial purpose of the stop has been fulfilled." *Lopez-Moreno*, 420 F.3d at 431.

Reasonable suspicion "exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the . . . seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). It "must be based on more than the officer's sense that a detainee appears to have something to hide." *United States v. Cavitt*, 550 F.3d 430, 436-37 (5th Cir. 2008). However, the reasonable suspicion standard "falls considerably short of satisfying a preponderance of the evidence standard" and instead looks to whether the "totality of the circumstances" creates a reasonable suspicion of criminal activity. *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

12

The undersigned finds that the traffic stop was not unreasonably extended as the deputies had reasonable suspicion to continue the traffic stop by the time the initial purpose of the stop had been completed.  The deputies pointed to several "specific and articulable facts" which lead them to believe there may be additional criminal activity occurring.  Both Hines and Bennett noted numerous times that Kendrix was behaving nervously, reaching repeatedly for his pocket, attempting to prevent officers from searching his right pocket during a pat-down, and fumbling through papers to find requested documentation.  [doc. #24]; *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.").  Although Kendrix is correct that nervousness and inconsistencies alone are insufficient to give rise to reasonable suspicion [docs. #20, 30, 33] they contribute to the Court's evaluation of the totality of the circumstances.  *See Estrada*, 459 F.3d at 632.

Further, the area in which Kendrix was stopped was a known high-crime area, which is what prompted the presence of the deputies in the first place.  (Tr. 5-6); *see United States v. Gonzalez*, 2024 WL 3338596 at *8 (5th Cir. 2024) (holding that a defendant being stopped in a known drug trafficking area was a factor in developing reasonable suspicion to prolong a traffic stop).  These factors were only exacerbated by Kendrix's conflicting stories regarding his criminal history.  *United States v. Pack*, 612 F.3d 341, 361-62 (5th Cir. 2010) (holding that a defendant's extreme nervousness, conflicting stories, and presence on a known drug corridor, coupled with the arresting officer's experience, combine to establish reasonable suspicion).

Based on the totality of these circumstances, it was not unreasonable for the deputies to suspect that Kendrix was involved in criminal activity.  *See Estrada*, 459 F.3d at 632 (finding that inconsistent statements, in combination with physical evidence indicative of drug trafficking, gave rise to reasonable suspicion); *Gonzalez*, 328 F.3d at 758 (finding that nervousness, in combination

13

with inconsistencies, prior drug arrest, and travel on a known drug trafficking corridor, gave rise to reasonable suspicion); *United States v. Wallstrum*, 515 F. App'x 343, 351 (5th Cir. 2013) (finding that containers of energy drinks, water bottles, and snack containers, in combination with nervousness, inconsistent statements, travel on a known drug corridor, and travel with another vehicle, created reasonable suspicion). Likewise, previous arrests can contribute to reasonable suspicion, even though a previous arrest alone would be insufficient to give rise to reasonable suspicion. *See Gonzalez*, 328 F.3d at 758. Based on the testimony, it is clear that each of these articulable facts occurred prior to the completion of the traffic stops initial purpose. (Tr. 23). Further, Hines informed Kendrix of his intention to have Bennett conduct an open-air sniff of the vehicle prior to, or at the very least simultaneously, with Bennett finally receiving confirmation from dispatch that Kendrix had no outstanding warrants. *Id*.

The traffic stop itself was also not unreasonably prolonged by the deployment of K-9 Ready. After developing reasonable suspicion of other crimes during a traffic stop, an officer is permitted to detain the car's occupants for a reasonable amount of time to dispel the suspicion. *Id*. at 350. Delays of up to ten minutes in the deployment of a canine after reasonable suspicion has been developed have been found to be reasonable. *United States v. Smith*, 952 F.3d 642, 650-51 (5th Cir. 2020). Here, there was little-to-no delay in the deployment of the canine, as K-9 Ready was in the patrol unit with Bennett and Hines, with Bennett being his trained handler. (Tr. 74).

Therefore, the undersigned finds that the deputies did have reasonable suspicion to deploy the canine. As the remainder of Kendrix's arguments for suppression hinge on the inability of the Government to establish reasonable suspicion, the arguments regarding the admission of evidence found a result of the probable cause search of the vehicle and Kendrix's confessions after receiving his Miranda warnings must also fail.

Accordingly, **IT IS RECOMMENDED** that Kendrix's Motion to Suppress be **DENIED**.

### CONCLUSION

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FED. R. CRIM. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under FED. R. CRIM. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSEDFACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 18th day of March, 2026.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

15